THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANGIE COWAN HAMADA, REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, on behalf of the National Labor Relations Board, | ) ) ) ) ) | No. 25 C 541 |
| | ) | Chief Judge Virginia M. Kendall |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) ) | |
| LABORFORCE, LLC, M&K EMPLOYEE SERVICES, M&K TRUCK CENTERS | ) ) ) | |
| *Defendants.* | ) | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is Plaintiff Angie Cowan Hamada's, Regional Director of Region 13 of the National Labor Relations Board, ("NLRB"), Motion to Try Petition for Preliminary Injunction under § 10(j) of the National Labor Relations Act[1] ("NLRA") on the Transcripts of the Administrative Law Judge Hearing. 29 U.S.C. §160(j). The Director seeks to reinstate a Collective Bargaining Agreement ("CBA") that existed between Plaintiff and Defendant Laborforce, LLC ("Laborforce") on behalf of their employees, while its claim as to whether Laborforce improperly withdrew from the agreement is pending before an Administrative Law Judge ("ALJ"). For the following reasons, the Motion [8] is denied.

---

[1] The NLRB is an independent federal agency whose purpose is to protect employees' rights under the NLRA. The NLRA protects employees' rights to unionize and bargain collectively through representation of their choosing, among other things. *See Alivio Medical Center v. Abruzzo*, 2024 WL 4188068, *1 (N.D. Ill. Sept. 13, 2024); 29 U.S.C. § 151 *et seq*. The NLRB has the "sole statutory authority to adjudicate allegations that an employer or union has committed an unfair labor practice." *Id.* (citing *Costello v. Grundon*, 651 F.3d 614, 624 (7th Cir. 2011)). Under 29 U.S.C. § 160(j), this Court has "jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

**BACKGROUND**

Laborforce is a business that leases employees to Illinois truck dealerships. (Dkt. 22 at 3). In 2019, Laborforce began providing employees to M&K Quality Truck Sales of Summit, LLC ("M&K Summit") (*Id.*) Laborforce recognized the Automobile Mechanics Local No. 701 ("the Union") as the bargaining representative for the employees of M&K Summit under a single collective bargaining agreement (CBA). (*Id.*)

The CBA covered two units of M&K Summit employees: the Parts Department and the Service Department. (Dkt. 22 at 3). Employees in the two departments have different job duties, cultures, locations of work, are managed by different supervisors, and have different Union Stewards. (*Id.*) The Parts Department's Union Steward, Joe Loman ("Loman"), understood the two departments to be separate units for bargaining purposes. (*Id.* at 4; *see also* Dkt. 22-1 at 3–4, Laborforce's Post-Hearing Brief).

On July 6, 2023, Loman presented Laborforce with a petition signed by a majority of his unit, asking Laborforce to withdraw its recognition of the Union as the employee's bargaining representative. (Dkt. 15-4, Joint Exhibit of Stipulated Facts). Acknowledging the majority's request, Laborforce posted a memorandum on July 7, 2023, indicating its intent to withdraw recognition of the Union as the bargaining agent of the Parts Department employees effective at midnight on September 30, 2023. (Dkt. 22 at 6). Laborforce posted the notice to all M&K Summit's employees and informed the Parts Department employees that their wages, health insurance, and 401(k) plans would change. (Dkt. 15 at 3; *see also* Dkt. 15-2 at 189:4–23, Loman's Testimony to ALJ).

In response to Loman's petition, on July 7, 2023, the Union filed its first charge against Laborforce alleging that Laborforce had improperly withdrawn its recognition of the CBA. (Dkt.

2

22 at 6; *see also* Dkt. 1-1, First Charge[2]). It alleged the withdrawal was improper because Laborforce had only received a majority approval from the Parts Department, not the *entire* bargaining unit. (*Id.*) The Director did not seek an injunction under § 10(j). (Dkt. 22 at 6–7). On July 25, 2023, after already notifying the Union of the employees' request, Laborforce filed a "representation petition" seeking to remove the Parts Department from the established single bargaining unit, which the Union dismissed, and the NLRB denied upon review. (Dkt. 15 at 3–4). The Union brought Loman to the regional NLRB office and explained to him that to properly withdraw recognition of the Union, he needed to obtain a majority of the signatures from all departments. (Dkt. 22 at 7; *see also* Dkt. 15-2 at 191:8–13, 199:12–19).

On June 7, 2024, Loman presented a second petition to Laborforce, stating that a majority of *all* employees no longer wanted to be represented by the Union and requesting that Laborforce withdraw recognition of it; unlike the first petition, this petition contained a majority of Parts Department *and* Service Department employees' signatures.[3] (Dkt. 22 at 7; *see also* Dkt. 15-2 at 200:2-9; Dkt. 15-4 ¶ 4). Laborforce withdrew its recognition of the CBA and informed the Union. (*Id.*)

On June 10, 2024, the Union filed a second charge against Laborforce alleging that Laborforce's withdrawal violated § 8(a)(5) of the NLRA.[4] (Dkt 22 at 7; Dkt. 1-5, Second Charge). The NLRB suggested that Laborforce's improper conduct had weakened support for the Union among the employees such that the withdrawal process was tainted. (Dkt. 15 at 4).

On October 8–9, 2024, the parties tried the case before ALJ Melissa Olivero, in a consolidated proceeding, to determine whether Laborforce's conduct had tainted the withdrawal

---

[2] The charge has since been amended. (*See* Dkt. 1-3, 1-4, Case 13-CA-321415).
[3] In total, the Parts Department has 31 employees and the Service Department has 51 employees. (Dkt. 51-4 ¶ 1).
[4] Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).

process such that it was illegitimate, notwithstanding that majority of employees in both units now wished to end Union representation. (Dkt. 22 at 7; *see also* Dkt. 15-2; Dkt. 15-3, Official Report of Proceedings). In January 2025, the NLRB filed this Motion seeking to reinstate the Union as the employees' bargaining representative. (Dkt. 15). The ALJ has yet to reach a decision in the case. (*See* Dkt. 33).

## LEGAL STANDARD

"Under [Section] 10(j) of the [National Labor Relations] Act, courts may grant temporary injunctions pending the Board's resolution of unfair labor practice cases." *Ohr v. Arlington Metals Corp.*, 148 F. Supp. 3d 659, 672 (N.D. Ill. 2015) (quoting *Harrell ex rel. N.L.R.B. v. Am. Red Cross, Heart of Am. Blood Services Region*, 714 F.3d 553, 556 (7th Cir. 2013)). "Interim relief is 'just and proper' when four factors are present: (1) [the] NLRB has no adequate remedy at law; (2) the Union will be irreparably harmed without interim relief, and that potential harm to the Union outweighs potential harm to the employer; (3) public harm would occur without the relief; and (4) the Board has a reasonable likelihood of prevailing." *Am. Red Cross*, 714 F.3d at 556 (citing *Lineback v. Irving Ready–Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011)); *see also Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 499–500 (7th Cir. 2008) ("The court looks to the same factors to which it looks in other contexts when deciding whether to grant injunctive relief[.]"). The Director has the burden of establishing the first, third, and fourth prongs; the second prong (irreparable harm) is evaluated on a sliding scale. *Spurlino*, 546 F.3d at 500.

Furthermore, "[a]n injunction granted under [S]ection 10(j) is an 'extraordinary remedy.'" *Irving Ready–Mix*, 653 F.3d at 570 (quoting *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297 (7th Cir. 2001)). As such, relief under Section 10(j) "should be granted only in those situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution

process." *Id.* The most important considerations in determining whether to grant injunctive relief are the likelihood of success on the merits and irreparable harm. *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023).

**DISCUSSION**

**I.      Likelihood of Success on the Merits**

Though the moving party "need not show by a preponderance of the evidence that [it] will win [its] suit, the mere possibility of success is not enough; [it] must make a 'strong' showing." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) (citing *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020)). When deciding whether to issue a § 10(j) injunction, because the Court "lacks jurisdiction to determine the merits of the underlying labor dispute . . . . [Its] inquiry is limited.[5]" *Sullivan v. Fairfield Parsippany, LLC*, 2025 WL 40086, at *7 (D.N.J. Jan. 7, 2025) (citations omitted). If the moving party cannot meet its burden, the Court must deny the injunction "regardless of how heavily any other equities may weigh in the [moving party's] favor." *Alivio Medical Center*, 2024 WL 4188068 at *4 (quoting *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 458 n.1 (7th Cir. 1993)).

**a.  Laborforce's First Withdrawal (Parts Department)**

The lawfulness of Laborforce's initial withdrawal from Union representation depends on whether the Parts Department and Services Department are properly considered a single bargaining unit. The Director contends that the two Departments are not distinct and, thus,

---

[5] In the Director's post-hearing brief to the ALJ, which she attached as Exhibit A to her Response Brief, she makes several constitutional arguments about the NLRA's adjudicative system. (Dkt. 22-1 at 17). Delving into the merits of these claims would require the Court to go beyond what it is necessary to resolve the Motion, and therefore, the Court defers judgment as to these claims. *See Spurlino*, 546 F.3d at 502 (in § 10(j) cases, district courts should not decide the merits, it should only evaluate *likelihood* of success).

Laborforce's July 7, 2023 withdrawal as to the Parts Department was improper, (Dkt. 27 at 6); Laborforce takes the exact opposite position. (Dkt. 22 at 9).

The NLRA confers broad discretion on the Board to determine what qualifies as a bargaining unit. *Part-Time Fac. Ass'n at Columbia Coll. Chicago v. Columbia Coll. Chicago*, 892 F.3d 860, 867 (7th Cir. 2018); *N.L.R.B. v. Mickey's Linen & Towel Supply, Inc.*, 460 F.3d 840, 842 (7th Cir. 2006) ("The Board has wide discretion to set rules and procedural safeguards to protect employees' freedom to choose bargaining representatives."). The statute gives specific instruction for how parties appeal a final Board order. 29 U.S.C. § 160(f). In relevant part, the statute states:

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business

*Id.* In other words, after the Board makes a final determination, the court of appeals may review the decision. Put differently, district courts do not have jurisdiction to opine on questions of representations and determinations of appropriate bargaining authority. *See Cent. States, Se. & Sw. Areas Pension Fund v. Old Dutch Foods, Inc.*, 968 F. Supp. 1292, 1297 (N.D. Ill. 1997). Indeed, even the courts of appeals' review of a final NLRB determination are "extremely limited." *Mickey's Linen*, 460 F.3d at 842.

Therefore, the Court will not assess Laborforce's arguments as to whether the Parts and Service Departments constitute a single bargaining unit. (Dkt. 22 at 9). Deferring judgment as to this ancillary issue will not preclude the Court's ability to evaluate whether reinstating the CBA is "just and proper." *Am. Red Cross*, 714 F.3d at 556; *see also Kinney v. Cook Cnty. Sch. Bus, Inc.*, 2000 WL 748121, at *8 (N.D. Ill. June 1, 2000) ("Section 10(j) relief is appropriate when, absent

an injunction, the efficacy of the NLRB's final order may be nullified or frustrated during NLRB proceedings."). That question is currently pending before the ALJ. Once the ALJ renders her decision and it goes through the NLRA appeal process, the parties may seek review from the federal court of appeals, in accordance with the statute. 29 U.S.C. § 160(f).

### b. Laborforce's Second Withdrawal (Both Departments)

The Director also contends that Laborforce's second withdrawal of recognition of the Union, in June 2024, was invalid under § 8(a)(5)—notwithstanding Loman presenting a petition for withdrawal signed by a majority of both departments—because Laborforce's prior conduct tainted the employees' opinions of the Union. (Dkt. 15 at 6). Employer conduct that "reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their protected rights" violates" the NLRA. *Contemp. Cars, Inc. v. N.L.R.B.*, 814 F.3d 859, 869 (7th Cir. 2016); *Nat'l Lab. Rels. Bd. v. Neises Constr. Corp.*, 62 F.4th 1040, 1058 (7th Cir. 2023) (such conduct can "poison the bargaining process.") (citations modified). The Board has stated, however, that "not every unfair labor practice will taint evidence of a union's subsequent loss of majority support." *Lexus of Concord, Inc. & Machinists Auto. Trades Dist. Lodge 190, Loc. Lodge 1173, Int'l Ass'n of Machinists & Aerospace Workers, Afl-Cio*, 343 NLRB 851, 852 (2004). There must be a causal relationship between the unfair labor practice and the loss of support. *Id.* "The criteria for determining whether a causal relationship has been established include: '(1) the length of time between the unfair labor practice and the withdrawal of recognition; (2) the nature of the violation, including the possibility of a detrimental or lasting effect on employees; (3) the tendency to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale,

organizational activities, and membership in the union.' " *Id.* (quoting *Master Slack Corp.*, 271 NLRB 78, 84 (1984)).

The first factor strongly weighs in favor of Laborforce because there was not proximity between the alleged taint and the alleged unlawful withdrawal. The Director argues that Laborforce unlawfully threatened the M&K Summit employees by posting notice of withdrawing recognition with only the Parts Department's support and informing the employees that they would be changing their wages, health insurance, and 401(k) plans, which led to the employees supporting the petition of decertification. (Dkt. 15 at 6). Laborforce disputes that they did anything to affect the employees' feelings towards the Union. (Dkt. 22 at 13–14).

In support of the Director's accusations, Plaintiff points to three letters, which it presented to the ALJ. (Dkt. 16-1 at 13–17, Exhibit GC 1-31, Part 2). Laborforce sent these letters on July 7, 2023, to its employees explaining that because it had received a petition signed by a majority of Parts Department employees, it would withdraw recognition of the CBA. (*Id.*)

The Court sees these letters differently; these letters do not seem like "threats." Instead, the letters detail the expanded benefits employees can expect. Notably absent from the letters is any coercive or threatening language. (*Id.*) One letter emphasizes: "Please be assured that Laborforce will continue to honor your current seniority and all PTO balances will remain in effect. There will also be no gap in health insurance coverage or pay for employees." (*Id.* at 15). This sort of accommodating language does not appear coercive.

Moreover, Laborforce's alleged threats occurred in July 2023, after being presented with a petition from a majority of the Parts Department requesting withdrawal of recognition of the Union. (Dkt. 15 at 3). Meanwhile, the petition containing a majority of all employees supporting the withdrawal was presented in June 2024. (Dkt. 22 at 7). These events occurred nearly a year

8

apart, undermining a causal connection between the alleged unfair labor practice and the loss of majority support. *Beverly Farm Found., Inc. v. N.L.R.B.*, 144 F.3d 1048, 1054 (7th Cir. 1998) (closer temporal proximity between unfair labor practice and withdrawal of recognition makes § 8(a)(5) violation more likely); *see also Tenneco Auto., Inc. v. N.L.R.B.*, 716 F.3d 640, 648 (D.C. Cir. 2013) (holding that months between unfair labor practice and petition for decertification is a long enough amount of time to sever a causal link). The first factor, therefore, does not support the notion that Laborforce tainted the decertification process.

The second factor also weighs in Laborforce's favor because the alleged misconduct seemed to benefit the employees, not harm them. (Dkt. 15 at 9). Without detail, the Director argues that these "inflated benefits," which Laborforce gave to the Parts Department employees persuaded other employees to cut ties with the Union. This ignores the fact that Loman testified that he personally worked to gain support to decertify the Union. (Dkt. 15-2 at 9). Loman's efforts may have given Laborforce "a good faith doubt" as to the unit's continued support for the CBA "based on objective evidence of the Union's continued majority status." *Rock-Tenn Co. v. N.L.R.B.*, 69 F.3d 803, 808 (7th Cir. 1995). What's more, transcripts of the proceeding before the ALJ suggest that the Board agent prompted Loman's effort to obtain a true majority of signatures in support of withdrawing recognition of the CBA—not Laborforce. (*See* Dkt. 15-2 at 49). These signatures would suggest that Laborforce had the requisite good faith doubt of continued majority support for the CBA. *Rock-Tenn*, 69 F.3d at 808.

For similar reasons, the third and fourth factors (i.e., whether Laborforce caused worker disaffection and affect of unlawful conduct on worker morale), weighs in Laborforce's favor. As far as the Court can tell, Loman organized the decertification process, even before any of the benefits changed. This undermines a proposition that Laborforce's expanded benefits caused

workers to become disaffected with the Union. Furthermore, the Director fails to provide sufficient evidence that the benefits persuaded workers to lose faith in the Union.

When a party seeks a preliminary injunction under § 10(j), the Court may not evaluate the merits of the case; it should only assess the moving party's likelihood of success. *Spurlino*, 546 F.3d at 502. At this stage, the Court is skeptical that the Director has carried her burden.

### II.      Irreparable Harm and Adequate Remedy

Assuming, however, that the Director does establish a likelihood of success, she must also show that irreparable injury is likely to occur in the absence of an injunction. *Int'l Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."). Harm to a party is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.' " *Id.* (citing *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). Because time is usually of the essence, "[w]hen the petitioner delays in seeking interim relief . . . it weighs against finding that the petitioner faces irreparable harm." *Ohr*, 148 F. Supp. at 673 (citations omitted) (citing *Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979)).

The Director delayed significantly in seeking the injunction. The Director filed its first charge against Laborforce in July 2023 after Loman presented a petition showing the Union lost majority support from the Parts Department. (Dkt. 1-1). It did not seek an injunction then. It filed its second charge in June 2024 after Loman presented a petition showing a majority of Parts *and*

Service Departments employees no longer supported the Union. (Dkt. 1-5). It was not until January 2025 that the Director finally sought an injunction. (Dkt. 1 at 17). The Board, therefore, did not file its request for an injunction until 18 months after it had lost majority support from the Parts Department and 6 months after it had lost support from both units. Exacerbating this problem, after Loman presented his petition with only Parts Department signatures, Board Agent Helen Gutierriez "did not reject it[,]" but rather encouraged Loman to get signatures from Service unit members as well. (Dkt. 15-2 at 49). This undermines the notion that time is of the essence in this case. *See e.g. Ixmation, Inc. v. Switch Bulb Co.*, Inc., 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) (longer the delay after knowledge of alleged irreparable harm undercuts petitioner's position); *LandAirSea Sys., Inc. v. Synchronize Income Dev., LLC*, 2024 WL 1657355, at *8 (N.D. Ill. Feb. 8, 2024) (same).

Second, though the ALJ has not issued her ruling, the normal administrative process is working. The Union has been out of favor from a majority of employees for over a year. (*See* Dkt. 1-5). This suggests that the work the Union would have to do to rebuild support for the alleged unfair labor practices has plateaued and, thus, would be similar if the Court issues an injunction or if it waited for the ALJ to render a decision. *See McKinney ex rel. N.L.R.B. v. S. Bakeries*, LLC, 786 F.3d 1119, 1125 (8th Cir. 2015) (finding no irreparable harm where Union had "long been out of favor" and work required to rebuild support would be similar with or without injunction). Moreover, as it stands, the employees are currently making more than they were making under the Union contract and have expanded benefits. (Dkt. 33 at 6, Transcript of Proceedings). The normal administrative process, which is well under way, will constitute adequate relief rather than a judicially imposed "extraordinary remedy." *Irving Ready–Mix*, 653 F.3d at 570 (quotation marks and citation omitted).

### III.    Public Harm

Finally, the Court must also consider the "the public interest in the integrity of the collective bargaining process." *Am. Red Cross*, 714 F.3d at 557 (citations omitted). The collective bargaining process is built upon the employee rights established under 29 U.S.C. § 157. Under the statute, "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing[.]" *Id.* These statutory rights also include "the right to refrain from any or all of such activities[.]" *Id.*

Like in *Ohr*, this case is about what the Laborforce employees want. 148 F. Supp. 3d at 678. Though there is a dispute about how Loman obtained support, a majority of employees from both units expressed their desire that Laborforce withdraw its recognition of the Union. Dkt. 22 at 7; *see also* Dkt. 15-2 at 200:2-9; Dkt. 15-4 ¶ 4). This could show employees are exercising their statutory right to refrain from choosing the Union as their bargaining representative. Moreover, "[a]n injunction granted under section 10(j) is an "extraordinary remedy" and should be granted only in those situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution process. *Irving Ready-Mix*, 653 F.3d at 570. Here, this is not the case. The Director, therefore, has not carried her burden as to these factors.

**CONCLUSION**

For the reasons set forth above, the Director's Motion [8] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: September 22, 2025